Fboessel, J.
This is a proceeding to review the tax assessment on petitioner’s premises for the year 1952-53. The assessment for that year, as fixed by the appellant Tax Commission, totaled $3,875,000. Included therein was a $3,000,000 “ progress ” assessment representing the value of an improvement, under construction, but uncompleted, on January 25, 1952, the status date for the tax year in question. Special Term, and the Appellate Division by a divided court, held that the construction of the improvement was commenced after January 25, 1951, and hence this progress assessment was in violation of section 157-1.0 of the New York City Administrative Code. Petitioner’s total assessment was accordingly reduced to $875,000.
Section 157-1.0, with interpolation of the years relevant to this proceeding, provides: 11 Taxable status of building in course of construction.- — -A building in course of construction, *419 commenced since the preceding twenty-fifth day of January [1951] and not ready for occupancy on the twenty-fifth day of January following [1952], shall not be assessed unless it shall be ready for occupancy or a part thereof shall be occupied prior to the fifteenth of April [1952].” (Emphasis supplied.) The parties agree that the subject building was not ready for occupancy on January 25 or on April 15,1952, nor was a part thereof occupied on April 15, 1952. Hence, on this appeal, we must determine as a matter of law whether, on the basis of the undisputed factual evidence adduced below, ‘1 construction ’ ’ of the building on petitioner’s property “ commenced” prior or subsequent to January 25, 1951, within the meaning of section 157-1.0 of the Administrative Code.
The undisputed facts in the case reveal that excavation was commenced on November 22, 1950. The materials excavated were primarily rock. The procedure followed was, first, to “blow out the rock” until the general floor elevation was reached. Then, at points where bearing columns were to be located, blasting was continued until rock of sufficient tensile strength — called “design” rock — for the bearing of the building was found. As soon as this design rock was reached, a hole of about 4 to 6 feet square was chipped out. The depth of the holes varied from 18 inches to 6 feet, depending upon the location of the design rock beneath the surface of the general floor elevation. After each of these holes (there were 250) was blasted and chipped out, an inspector from the building-department was summoned to inspect the rock exposed at the bottom of the hole. The inspector would ascertain whether it was design rock, and would accordingly pass or reject it. Upon approval of the rock at the bottom of each hole, concrete, which ranged in quantity from 1 to 10 cubic yards, was poured into the hole. By January 25, 1951 concrete was poured into 98 of these holes.
It was revealed during the course of the trial that these holes, when completely filled with concrete, served as “ piers ”. Piers constitute a part of the foundation of the building, and provide a means for support, transmitting the weight of the building to the rock. In terms of the superstructure of the building, there were piers to begin with, above each pier a “pedestal”, and then the columns or walls above the pedestals. Some of the pier *420 holes into which concrete was poured prior to January 25, 1951 — particularly those located in the southeast sector of the building — -were filled to grade level with the concrete. The piers, in the language of petitioner’s witness, were in those instances “ automatically poured ”. The remainder of the 98 piers poured prior to January 25th were filled close to grade level. As said witness stated at the trial, the pier holes were filled with a sufficient quantity of concrete so as to “ prevent water ” or “ dirt going into the hole, or something else like that”. There was also evidence that, prior to the status date, forms for the east wall were erected, and reinforced steel placed therein.
There can be no doubt that piers in the southeast sector were completed prior to the status date, ready for the second level of the foundation, the pedestals to be placed upon them. With regard to the other pier holes, though in some cases not completely filled, they were at least partially completed foundation piers. In any event, whether the foundation piers were partially or totally completed, as were some of them, the test which has evolved from the case of People ex rel. New York Cent. & H. R. R. R. Co. v. Purdy (216 N. Y. 704) has been satisfied here.
In that case, we passed upon section 889a of the Greater New York Charter, the forerunner of section 157-1.0, as applied to the construction of the Hotel Biltmore in New York City. The majority of the Appellate Division (167 App. Div. 637) had held that, by excavation, a building is in the course of construction. Justice Scott disagreed and we reversed the Appellate Division upon his “ dissenting opinion”. He expressed the view that excavation of a site, without more, did not constitute the commencement of construction within the meaning of the statute. A line of division, for purposes of tax exemption, was drawn between the mere digging or excavation of the soil or rock and the introduction and use for construction purposes of materials foreign to the soil which eventually become a part of the completed improvement. In the latter situation, construction is deemed to have commenced. A building is then “ actually and literally in the course of construction ” (Bushey & Sons v. American Ins. Co., 237 N. Y. 24, 28).
In the instant case, construction had advanced beyond the stage of mere excavation prior to the status date. The concrete, consisting of cement, stone and sand, poured into the pier holes *421 by that date constituted the material foreign to the soil which was set in place at the premises and eventually became an integral part of the completed building.
It is clear from Justice Scott’s summary of the evidence in the New York Central case (supra), read in the light of his interpretation of the words “ construction ” and “ commenced ”, that the pouring of concrete, as we have here, is decisive for purposes of section 157-1.0. He there stated that prior to the status date no work other than excavation was done, and it was not until 1% months later that “ concrete ivas placed for the grilling foundations designed to support the columns of the hotel building” (167 App. Div., p. 643; emphasis supplied).
Petitioner’s characterization of the pouring of concrete in this case as a “ sealing ” process for the purpose of protecting the design rock from atmospheric conditions does not alter the situation. The motivation for pouring of concrete is not controlling, but rather the end result achieved (see dissenting opinion below 8 A D 2d 791; see,, also, People ex rel. Shelton Holding Corp. v. Goldfogle, 220 App. Div. 451). Although by such pouring the underlying rock was sealed for protection — and sealing per se required very little concrete — it is the fact that, in addition thereto, partially completed, and in some instances completed, piers for support of the building were created which constituted a part of the completed structure. Hence “construction” of petitioner’s building-had “ commenced ”.
Were we to grant petitioner an exemption from the instant assessment, the purpose of the statute would be defeated. In People ex rel. 176 W. 87th St. Corp. v. Cantor (230 N. Y. 312, 315) we said: “ The purpose of section 889a of the charter undoubtedly was to encourage building by extending to owners a limited exemption from taxation during the time when no income would be derived from the capital invested. Until a building could be occupied for living purposes it was not to be presumed that there could be much income from rentals.” (Emphasis supplied.) In this case, petitioner applied for a certificate of occupancy on April 18, 1952, three days after occupancy would have defeated its exemption in any event. A temporary certificate was granted on April 28, 1952. The building was then ready for occupancy and could, therefore, *422 produce rental income. The tax assessed here on January 25, 1952 was for the tax year 1952-53, which commenced in July, 1952. Granting petitioner in this case an exemption would, therefore, mean that petitioner’s building was capable of yielding income for 14 months (from May, 1952 through June, 1953), and yet it would not be obligated to pay a property tax on the improvement. This would be far more than the ‘ ‘ limited exemption ” contemplated by the statute.
The orders of the Appellate Division and Special Term should be reversed, and the assessment as originally imposed by the Tax Commission reinstated, with costs.
Judges Dye, Fuld, Van Voorhis, Burke and Foster concur with Judge Froessel; Chief Judge Desmond dissents and votes to affirm for the reason that on the proof here, particularly the testimony of Benz and the work sheets, there was a question of ultimate fact as to whether or not the actual construction of this building began before January 25, 1951.
Order reversed, with costs in all courts, and the tax assessment reinstated.